UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

                                         :

DEVELOPMENT SPECIALISTS, INC., as  :
Plan Administrator of Coudert     :
Brothers LLP,                      :
                 Plaintiff, :  09 Civ. 4084 (KBF)
                                           :

        -v-                 :      OPINION
                                  :      AND ORDER

WEISER REALTY ADVISORS LLC, GERALD  :
R. SANDERS, and JOHN W. HOUCK,     :
                Defendants.:
                                         :

------------------------------------X

KATHERINE B. FORREST, District Judge:

     In April 2009, plaintiff Development Specialists, Inc., as

the Plan Administrator for the now defunct law firm, Coudert

Brothers LLP ("Coudert"), brought a one-count action for so-

called negligent appraisal against Weiser Realty Advisors LLC

("Weiser"), Gerald R. Sanders and John W. Houck.  Defendants

have now moved for summary judgment and to exclude the testimony

of plaintiff's appraisal expert.  For the reasons set forth

below, both motions are GRANTED.

BACKGROUND

     Founded in 1853, Coudert was a storied, international law

firm headquartered in New York.  In August 2005, faced with

declining profitability, the equity partners of the firm voted

to wind up its affairs.  (Decl. of Charle B. Keefe in Opp. to

Defs.' Mot. for Summary Judgment ("Keefe Decl.") at ¶¶ 3, 8;

1

Pl.'s Response to Defs.' Rule 56.1 Statement ("56.1 Response")
No. 2.)  At the time, the firm was also considering a potential
sale of its New York practice to the law firm Baker & McKenzie.
(56.1 Response No. 2.)

While the firm was contemplating a transaction with Baker &
McKenzie, Coudert engaged Weiser to provide a valuation of
Coudert's remaining interest in the lease for its New York City
office space at 1114 Avenue of the Americas (the "Grace
Building").  (*Id.* Nos. 1-2.)  Weiser was made aware that Coudert
was considering a merger or consolidation with Baker & McKenzie
when it was retained.  (*See* Compl. at ¶ 72; Answer at ¶ 72.)
Coudert's lease was for floors 4, 37 and 40-45 of the Grace
Building and expired May 30, 2013.  (Compl. at ¶ 29; Answer at
¶ 29.)  At the time of the appraisal, Coudert was subleasing
portions of its premises on the 37, 40, 41 and 45th floors.
(Compl. at ¶ 43; Answer at ¶ 43.) Coudert was also paying below
market rent for its office space.  (56.1 Response No. 3.)  Under
the terms of the lease, Coudert was obligated to split the
profits of any sub-lease of the space with the landlord 50-50.
(*Id.* No. 4.)

Weiser issued its Complete Appraisal in a Self-Contained
Report of the Leasehold Estate Held by Coudert Brothers LLP on
August 19, 2005, valuing the leasehold interest at $18 million
as of September 1, 2005.  (*Id.* 6; Decl. of William J. Kelly in

2

Support of Mot. for Summary Judgment ("Kelly Decl.") Ex. C.)  In

its cover letter to that report, Weiser stated that its

valuation was based on the following considerations:

> [C]omparable market rental data for leases signed
> within the subject property, and the overall Midtown
> office market.  Additionally, [it] considered . . . 1)
> the location of the subject both within its market and
> within the overall Manhattan office market, 2) the
> strength of the Midtown office rental market, 3) the
> condition of the building and macro economic trends in
> the economy of New York City as of 2005.

(Kelly Decl. Ex. C at DSI 742.)  According to the report, Weiser

used those considerations to determine the fair market rental

rate for the leased premises.  It then took the cash flows that

would be generated at that market rental rate, subtracted the

current contractual cost to lease the space (*i.e.* the rent

Coudert was actually paying) and added the risk-adjusted profits

attributable to the portions of the space being sub-leased to

determine the total cash flow benefit of the leasehold position.

Finally it calculated the present value of the aggregate cash

flows.  (*See id.* at DSI 759, 771.)  Weiser certified that its

appraisal technique accorded "with the Uniform Standards of

Professional Appraisal Practice as promulgated by the Appraisal

Standards Board of the Appraisal Foundation and adopted by the

Appraisal Institute, and the Code of Professional Ethics of the

Appraisal Institute."  (Kelly Decl. Ex. C at DSI 747; *see also*

Compl. at ¶ 66.)  Weiser also certified that "[t]he statements

of fact contained in this appraisal and upon which the analyses, opinions, and conclusions expressed herein are based are true and correct."   (Kelly Decl. Ex. C at DSI 747.)

Weiser's report clearly reflects its awareness – alleged by plaintiff in the First Amended Adversary Complaint ("Complaint") (see Compl. ¶ 72) – that at the time of the appraisal Coudert was looking to merge with or be acquired by another firm who would assume the lease.  (See id. at DSI 767 ("the space is well suited to the use of an acquiring entity"), 769 (presuming that "the acquiring entity will take the space in its entirety, rather than attempting to sublease, or otherwise dispose of portions of the space"), 771 ("We believe that the terms of the lease give the tenant the right to merge or be acquired without any obligation arising to the landlord for a sharing of revenue of profits . . . .").)

Shortly after Weiser issued its report, Baker & McKenzie entered into an agreement to take over much of the Coudert office space in New York.  Although initially planned as a sub-lease of the space, the final agreement was a three-way transaction involving the landlord, whereby Baker signed a direct lease.  As part of the transaction, Coudert received approximately $16 million for its lease interest, of which $8 million went to the landlord consistent with Coudert's lease. (See 56.1 Response No. 16.)

In September 2006, Coudert filed for bankruptcy protection. (*Id.* at 17; Compl. at ¶ 1.)  The Bankruptcy Court appointed an examiner, former New York City Controller Harrison J. Goldin, to investigate, among other things, Coudert's pre-petition transactions, including the sale of its offices. (*See* Decl. of John G. McCarthy in Opp. to Defs.' Mot. for Summary Judgment ("McCarthy Decl.") at Exs. 1-2.)  The report submitted by the Examiner on that part of his investigation evaluates the Weiser appraisal in light of independent market data and concludes that the market rent Weiser used was "on the higher point" of "the then prevailing market range." (Kelly Decl. Ex. E at 37-38.)

Defendants' Expert Report

Defendants engaged the valuation firm of Duff & Phelps, and specifically Managing Director Brian E. Ginsburg, a certified real estate appraiser and member of the Appraisal Institute, to review and opine on Weiser's appraisal report.  (Kelly Decl. Ex. D at 3; *see also* 56.1 Response No. 21.)  Ginsburg's report begins with a discussion of the Uniform Standards of Professional Appraisal Practice ("USPAP"), which he states are "generally considered the quality control standards applicable for appraisal analysis in the United States, including real property." (Kelly Decl. Ex. D at 5-6.)  According to Ginsburg, USPAP requires that the appraiser "be familiar with and correctly utilize valuation methods that are acceptable to both

other appraisers and the intended users of the appraisal." (*Id.* at 6.) The commonly accepted professional standards for determining the fair market value of a leasehold interest, Ginsburg continues, are: (1) analysis of the contract rent as of the valuation date; (2) collection of comparable lease data; (3) projection of market rental rates for a period consistent with the lease term; and (4) discounted cash flow analysis based on a comparison of the contract rate and the market rental rate over the lease term. (*Id.* at 7-8.)

After laying out the applicable standards, Ginsburg evaluates Weiser's adherence to each of those standards. (*Id.* at 8-9.) He concludes that Weiser "follow[ed] the most commonly accepted professional standards in leasehold valuation," "applied the valuation methods needed to result in a credible and adequately reliable value relative to the intended use, and users, of the Appraisal Report," and "conducted its valuation of the leasehold estate of Coudert in accordance with USPAP as promulgated by [The Appraisal Foundation], and did not depart from the standards set forth in USPAP." (*Id.* at 9-10.)

Plaintiff's Expert Report and Testimony

For its part, plaintiff engaged the firm of Kahn, Hoffman & Hochman, LLP, through its partner Enid Hoffman, to review Weiser's report and conduct an independent appraisal of the Coudert leasehold position. (*See* Kelly Decl. Ex. F.) Hoffman

6

also prepared a rebuttal report in response to Duff & Phelps's report.  (*See* Kelly Decl. Ex. G.)  Unlike Ginsburg, neither Hoffman nor her partner were certified real estate appraisers.  (*See* Kelly Decl. Ex. H at 33:22-34:5.)  Hoffman does not identify any particular professional standard for valuing leasehold estates in either of her reports, other than citing Internal Revenue Service Revenue Ruling 59-60 for several general valuation guidelines applicable to all closely-held businesses.  She states that pursuant to Revenue Ruling 59-60, "the valuation of closely-held companies should consider the most applicable valuation procedures for the type of company as well as the nature of the stock being valued" but then fails to specify what "the most applicable valuation procedures" are in this case.  (Kelly Decl. Ex. F at 4-5; *see also* Ex. H at 95:10-17 ("Q:  What is Revenue Ruling 5960?  A:  That's the IRS ruling that you consider the most applicable valuation method for you.  It doesn't specifically identify which valuation.  It was just the most applicable.").)

     In her initial report, Hoffman concludes that while Weiser's cash flow projections "would be accepted in their final form as complete and correct[]," its valuation "does not produce the entire economic benefit to the landlord" because the building's value would have increased as a result of a potential sale or refinancing of the building. (*Id.* at 7, 11.)  Hoffman's

appraisal uses the Weiser cash flow projections but then applies an income capitalization method purportedly to calculate the added value due to "the availability of additional financing and possible sale." (*Id.* at 7.) She takes "the annualized 4th quarter 2005 Weiser income projection" and divides it by a capitalization rate based, in part, on the price garnered by the October 2006 sale of the Grace Building, to determine the hypothetical sale price Coudert's landlord would be willing to pay for the portion of the building attributable to the leased premises. Adding that price to Weiser's discounted cash flows, Hoffman calculates the total value of Coudert's lease at $31 million. (*Id.* at 8-12.)

Hoffman's rebuttal report reaches a difference conclusion. While it characterizes the cash flow analysis done by Weiser and confirmed by Duff & Phelps as "mathematically correct," it takes issue with two of Weiser's assumptions (in addition to Weiser's "basic premise that the total value of the lease is the discounted value of the increased cash flow," which Hoffman disputed in her initial report). (Kelly Decl. Ex. G at 1.) The first assumption relates to the cash flows attributable to the Thyssen Citgo Petcoke Corporation sub-lease, which, according to Hoffman (without explanation), should be "mark[ed] [] to a market rate lease and adjust[ed] for operating escalators." (*Id.*)

8

The second assumption is that smaller office spaces typically lease for slightly less per square foot than larger spaces.  Hoffman concludes that because there was an 8% vacancy rate in the midtown office market in July 2005 (she incorrectly says the "1995 Midtown market") and no new space on the market, there were limited opportunities for large tenants to rent "high floor, well configured, well appointed class A space" and so any such space would have rented at a higher price.  (*Id.* at 2.) Hoffman does not explain how she concludes from the 8% figure – which says nothing about the size or quality of the available space – that the vacant space is disproportionately small or of lesser quality.  Based on her revision of Weiser's assumption, Hoffman adds $3.00 per square foot to the net rent calculated by Weiser, which addition she states would yield "an extra $386,571 per year *for a present value of $18,284,835* using Weiser's 4.5% discount rate."  (*Id.* (emphasis added).)  Hoffman does not indicate in her report how an extra $386,571 per year for each of the remaining *eight* years on Coudert's lease could come to more than $18 million.  Nonetheless, she determines that Weiser's discounted cash flow analysis should have yielded $36 million in value, not $18 million.  (*Id.* at 2-3.)

On Hoffman's income capitalization point, her rebuttal report uses a different capitalization rate than her initial report – 5.5% instead of 5.25% - but provides no explanation for

the change.  (*Compare id.* at 2 *with* Kelly Decl. Ex. F at 11.)
The rebuttal report also points to the October 2006 sale of the
Grace Building for $998,669,016 as "proof of [the income
capitalization] theorem." (*Id.* at 2-3.)  "Assuming the building
was sold at a 5.5% cap rate," Hoffman asserts, the net operating
income attributable to the whole building would be $54,926,796.
The portion of that income attributable to the Coudert lease,
she states, is 5.38%, using what she says is Weiser's projection
of the yearly cash flows from the lease. (*Id.*)  Based on that
share, she calculates the portion of the total October 2006 sale
price of the Grace Building that corresponds to the Coudert
lease, which portion she determines to be $53,716,255.  (*Id.*)
Lastly, "[s]ince the typical sale analysis runs for 11 years,"
she reduces that amount by 3/11 or 27.27% - presumably because
as of September 2005 there were approximately 8 years left on
the Coudert lease – to find a rounded value of $39 million for
the leasehold interest. (*Id.*)  Hoffman's rebuttal report offers
both that figure and the $36 million figure from the augmented
cash flows as her final valuation.

Hoffman was deposed on February 10, 2011. (*See* Kelly Decl.
Ex. H.)  When she was asked at the beginning of the deposition
whether she had examined the Weiser appraisal for each of the
errors alleged in the Complaint, she said that she had not.
(*Id.* at 13:11-14.)  She also failed to identify any professional

standards upon which she had relied, despite being asked to do
so three separate times.

> Q:   What professional standards were you relying upon
> when you concluded that [Weiser] erred by not looking
> at the value of the lease to the landlord?
>
> A:   If you look at all the sales that I pointed out
> with, all the sales are done at a cap rate divided
> into the cash flow.
>     That is a general way to buy and sell buildings
> in the – I don't know about the world, but at least in
> New York City.
>     I mean I am now [Gary Kahn's (her partner's)]
> trustee on all of his 56 buildings.  I know about
> buildings.  I know how you sell buildings.
>     Buildings, especially office buildings, are sold
> on a cap rate of a – and it's done on their net
> income.
>     Well, everybody knows that you take the net
> income, divide it by the cap rate.
>     And in fact, a year later, this building was sold
> for $998 million.
>     It was done on a multiple of the net income.  So
> that's what they did a year later.
>
> .  .  .  .
>
> Q:   You may have lost sight of my question.
>     My question was what professional standards were
> you relying upon when you determined that Weiser
> should have looked at the value of the lease to the
> landlord, in valuating [sic] the lease?
>
> A:   I can't quote a standard, but to me, if you –
>
> Q:   Can you identify one?
>
> A:   Can I?
>
> Q:   Sure, absolutely.  Sorry
>
> A:   *To me*, if you're asking somebody as the – [the
> Bankruptcy Examiner] said, to appraise the fair market
> value.  *To me*, appraising the fair market value

doesn't mean you just do one element of the fair
market value.

. . . .

Q:   My question was, I asked you to identify the
professional standards that you utilized or followed
in determining that Weiser was negligent in not taking
into account the value to the landlord if he were to
repossess these premises?

A:   And I would get, I'll get back to you about what
number in the professional standards it is.
       But it is – as a, somebody with credentials in
forensic accounting that I have, when you appraise
something, just by using that word 'appraise,' you
mean you look at the entire asset.  You don't look at
one specific item of the asset.

(*Id.* at 25:10-30:15 (emphasis added).)  Hoffman subsequently

admitted that she had not considered whether Weiser's appraisal

departed from any professional standards when she wrote her

reports or prepared for her deposition.  Indeed, she conceded

that she had not even reviewed those standards prior to doing

her valuation or giving testimony.

Q:   At the time that you authored the report and
released the report on March 2, 2010, did you
understand that the report was being used, basically,
not to provide a different valuation, but rather to
say that there was a departure from acknowledged
standards by Weiser in the preparation of their
report?

A:   When I produced the report, the first report, my
goal was to say why the Weiser Report was not correct.
       I would have to read the definitions of the
standards and tell you, after I read it, about what
they departed from or not.

. . . .

Q:    So is it fair to say that what you're really
saying is that you have a different opinion as to the
value of the lease, rather than you believe that there
was specific standards that were not adhered to by
Weiser, which caused them to come to an incorrect
conclusion?

A:    I have just said to you, I don't know the
standards.  I would have to go back and read the
standards.  I cannot tell you that.
      All I can tell you is that when they said that
they appraised the value of the lease, they did not
appraise the full value of it.  To me, that has to be
a departure.

Q:    But you have nothing to base that on?

A:    Not at this moment.

Q:    You didn't at the time that you wrote the March
22 report?

A:    Correct.

Q:    You didn't at the time that you wrote the
December 9 report?

A:    Correct.

(*Id.* at 54:23-57:17.)  As for her report, Hoffman stated that it

is not an "appraisal report" and therefore need not utilize the

USPAP standard.  (*Id.* at 34:22-35:9.)

Instead, Hoffman testified that her approach of calculating

the value of the leasehold interest to the landlord (*see id.* at

85:23-86:2) was an idea that she and her late partner came up

with.

Q:    What parts of this report did you prepare?

A:    Well, as you said, it's a collaborative effort.
I did most of the writing.

It was some of his thoughts.  When Gary – I have to back up for a second.  Gary Kahn was a – he was our managing party [sic], but he also owned 58 pieces of property in the Manhattan area, and mostly in the Manhattan area.

He was a real estate pro at that, and I don't think there's anybody who knows more about real estate than he knew.

And that's why this was such a terrific thing for him to grasp underneath him.

So when he – when he got the assignment to begin with, we sat down and he's, *he came up with the idea* that because he's bought and sold so many buildings, that the value of a lease is not just the present value of the cash flows.

The value of the lease is the increment – the value of the lease is also the incremental value to the building.

*It was his idea*, and I opined to it, that the increase in the value to the building bringing everything from submarket leases to market leases, is part of the value of this lease.  And that was his idea.

*I ran with the idea.  And because I opined to the idea and we ran with the idea, and then we researched it and created this report.*

(*Id.* at 19:8-20:16 (emphasis added).)  Hoffman acknowledged

several times that she was not aware of the negotiations between

Coudert and Baker & McKenzie regarding assumption of the leases

when she wrote either of her reports.  (*Id.* at 51:6-12; 86:3-20;

113:2-9.)

Hoffman also admitted that the $5 to $8 million difference

in valuation between her first report ($31 million) and her

second report ($36 to $39 million) was not the result of any new

information or materials made available to her in the interim.

(*Id.* at 46:2-47:19; *see also* 120:17-121:4 (describing why she

provided "a range" of value in her rebuttal report).)  While she
testified that the second report was the correct one, she
acknowledged that she had taken no steps to withdraw the first
report or to advise anyone that the later one was more accurate.
(*Id.* at 119:18-120:16.)

Discussing the $18 million in additional income Hoffman's
rebuttal report derives from revising Weiser's assumption that
larger office spaces would fetch slightly less rent, Hoffman
testified that the $18 million was not based only on the eight
years left in Coudert's lease.  Rather, she explained, that
figure is the amount of additional income that will be earned
"over a 40-50 year period."  When defense counsel clarified that
such amount included income collected "[o]ver an extended period
of time going well beyond the lease," Hoffman responded "Oh,
absolutely."  (*Id.* at 92:13-20.)

## DISCUSSION

The parties spend a fair amount of briefing on both the
motions to exclude and for summary judgment arguing a question
irrelevant to the ultimate decision on either motion:  Whether
plaintiff's action is for appraisal malpractice or negligent
appraisal.  (Defs.' Reply Mem. Summary Judgment at 4-5; Defs.'
Reply Mem. Exclude at 6-7; Pl.'s Mem. Opp. Exclude at 10-11;
Pl.'s Mem. Opp. Summary Judgment at 4-5.)  However
characterized, the question raised by the Complaint - and the

focus of the record before the Court – is whether defendants failed to exercise due care when they appraised Coudert's lease interest in the Grace Building. (*See* Compl. at ¶¶ 75-76.)   In support of its affirmative position and in opposition to defendants' motion for summary judgment, plaintiff has proffered Hoffman's reports and deposition testimony (*see* Kelly Decl. Exs. F, G), which reports and testimony defendants now seek to exclude under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

*Daubert* Motion

     Under *Daubert*, the district court has an obligation to act as a gatekeeper with respect to expert testimony, whether proffered at trial or on a motion for summary judgment. *See, e.g., Major League Baseball Props., Inc. v. Salvino*, 542 F.3d 290, 311 (2d Cir. 2008); *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997).  As the Supreme Court stated in *Kumho Tire v. Carimichael*, 526 U.S. 137 (1999):

> The objective of that requirement is to ensure the reliability and relevancy of expert testimony.  It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*Id.* at 152.  Bearing on the reliability part of the gatekeeping function are the factors identified in *Daubert*:  (1) Whether a theory or technique can be or has been tested; (2) whether it

has been subjected to peer review and publication; (3) whether the particular technique has a high known or potential rate of error and whether there are standards controlling its operation; and (4) whether the theory or technique is generally accepted in the relevant scientific community. *Kumho*, 526 U.S. at 147-49 (holding that the factors set forth in *Daubert* apply to "technical" and "specialized" knowledge, not just "scientific" knowledge); *Amorgianos v. Nat'l Railroad Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002). The reliability inquiry is context-specific, and the question before the Court is "not the reasonablenss [of the expert's methodology] *in general*," but rather "the reasonableness of using such an approach . . . to draw a conclusion regarding *the particular matter to which the expert testimony was directly relevant*." *Id.* at 153-54; *accord RFMAS, Inc. v. So*, 748 F. Supp. 2d 244, 250 (S.D.N.Y. 2010). Regardless of context, however, it is well settled that speculative or conjectural expert testimony is properly excluded on a motion for summary judgment. *See, e.g.*, *Salvino*, 542 F.3d at 311.

Here, the methodology Hoffman employs is unreliable both in light of the dispositive issue in this case and on the face of the *Daubert* factors. The question presented by the Complaint is whether Weiser exercised due care given the commonly accepted professional standards in the industry. Accordingly, Hoffman's

17

total failure to engage with those standards either in her own appraisal or in her assessment of Weiser's report makes her approach particularly unreasonable. *See Kumho*, 526 U.S. at 153-54; *RFMAS, Inc.*, 748 F. Supp. 2d at 250. Hoffman's technique also runs afoul of the *Daubert* factors, which recognize "whether there are standards controlling [the technique's] operation" and "whether the theory or technique is generally accepted in the relevant scientific community" as bearing on the reliability of expert testimony. *See, e.g., Kumho*, 526 U.S. at 147-49.

At her deposition, Hoffman was unable to identify any professional standards on which she had relied in preparing her reports, despite being asked repeatedly to do so. (*Id.* at 25:10-30:15.) She admitted that she had not even considered whether Weiser's appraisal departed from the professional standards, and, indeed, conceded that she did not even know what the standards were. (*Id.* at 54:23-57:17.) She also failed to cite any professional literature in support of her position. (*Id.* at 53:5-17.)

Instead, Hoffman testified that her methodology of calculating the value of the leasehold interest to the landlord (*see id.* at 85:23-86:2) (which used Weiser's cash flow data as a starting point) was based on "the idea" of one of her partners, derived from his personal experience owning a large number of properties in the Manhattan area. (*Id.* at 19:8-20:16.) That

idea – in addition to departing from the USPAP standards, which
Hoffman admitted (*see id.* at 34:22-35:9; *see also* Kelly Decl.
Ex. D) – was also speculative, based on her conjecture that the
landlord in September 2005 might potentially have sold or
refinanced the Grace Building (*see* Kelly Decl. Ex. F at 7, 11).[1]
Such an approach – different than that used by other experts in
the industry (*see* Kelly Decl. Ex. D (explaining the commonly
accepted, professional appraisal practices)), without known
validation in the industry literature, and "connected to
existing data only by the *ipse dixit* of the expert" – is not
reliable, especially in light of the determinative question in
this action.[2] *See Kumho*, 526 U.S. at 157; *see also Jones v.*

---

[1]    In Hoffman's rebuttal report, she indicates that the October 23, 2006
sale of the Grace building – over a year after Weiser's valuation – is proof
of her theorem. (*See* Kelly Decl. Ex. G at 3.)  According to Hoffman, "it
takes 7-12 months to make the decision to sell and conclude (package, market,
bid, negotiate and conduct the necessary due diligence) a sale on a building
of this size.  This might mean that the owners began the selling process very
shortly after settling with Coudert."  Even if Hoffman's speculation about
when the building owners began the sale process is correct, that date is
still after Weiser's valuation, and neither Hoffman has opined, nor has
plaintiff presented any evidence, that the landlord was considering a sale as
of the appraisal date. If the landlord decided to sell the building after
September 1, 2005, Hoffman has not explained why due care required Weiser on
that date to consider the value attributable to a potential sale of the
building.
[2]    Plaintiff's citation to New York case law for the proposition that the
income capitalization approach is a generally accepted method for appraising
real estate cannot validate Hoffman's methodology.  (Pl.'s Mem. Opp. Exclude
at 7-8.)  Those cases all involve the appraisal of owned properties, not of
fixed-term leaseholds for only portions of buildings.  Neither Hoffman nor
plaintiff has offered any evidence to dispute Duff & Phelps's expert
testimony regarding the commonly accepted professional standards for valuing
leaseholds like Coudert's. (*See* Kelly Decl. Ex. D.)
       It is also worth noting other indicia of unreliability in Hoffman's
reports:  Her appraisal of the leasehold interest is $5 to 8 million more in
her second report – a difference she admits at her deposition is not
attributable to her review of any new materials or information.  (Kelly Decl.
Exs. F, G, H at 46:2-47:19.)  She also conceded that she had not taken any

*United States*, 720 F. Supp. 355, 367 (S.D.N.Y. 1989) (concluding that expert's "personal opinion and differing professional judgment would not support a malpractice claim").  Accordingly, Hoffman's testimony should be excluded.

Summary Judgment Motion

Summary judgment is proper only "if the evidence, viewed in the light most favorable to the party against whom it is entered, demonstrates that there are no genuine issues of material fact and that the judgment [is] warranted as a matter of law." *Barkley v. Penn Yan Central School Dist.*, No. 09-3975-cv, 2011 WL 3890442, at *1 (2d Cir. Sep. 6, 2011) (internal quotation marks omitted).  "Although the burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists, the non-moving party nonetheless must come forward with specific facts showing that there is a genuine issue of material fact for trial." *Id.* (internal citation and quotation marks omitted); *accord Caracciola v. City of New York*, No 95 Civ. 3896 CSH, 1999 WL 144481, at *3 (S.D.N.Y. Mar. 17, 1999) ("the non-movant must offer 'concrete evidence from which a reasonable juror could return a verdict in his favor'"

---

steps to withdraw her first report or advise anyone that her later report was "the more accurate one."  (Kelly Decl. Ex. H at 119:18-120:16.) Additionally, her calculation of the additional cash flows generated *over a 40-50 year period* as a result of her revised assumption that larger spaces would demand higher rents is plainly flawed given the reality of Coudert's fixed-term lease, on which fewer than *8 years* remained.  (*Id.* at 92:13-20; Kelly Decl. Ex. G at 2.)

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986))).  It is well-settled that conjecture and speculation are insufficient to create a genuine issue of fact.  *See, e.g.*, *Barkley*, 2011 WL 3890442, at *1.  Moreover, not every disputed fact is material.  "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment.'"  *Matthews v. Malkus*, 377 F. Supp. 2d 350, 355-56 (S.D.N.Y. 2005) (quoting *Anderson*, 477 U.S. at 248).

It is well known that a district court should not resolve genuine and material factual disputes on a motion for summary judgment.  Where, as here, however, the non-movant has failed to put forth any admissible evidence creating a material question of fact, summary judgment is appropriate.

The Court has reviewed the parties' Rule 56.1 Statement and Counterstatement and the accompanying record.  With respect to critical factual propositions put forth by defendants (including regarding Weiser's methodology, the applicable professional standards and whether Weiser departed from them), plaintiff simply "punts" – *i.e.* it neither admits nor denies the facts, but instead states that they are not supported by admissible evidence or are immaterial to plaintiff's claim.  (*See* 56.1 Response Nos. 5, 7-8, 11-15, 22-24, 26-30.)

While it is certainly true that Local Rule 56.1 requires
proposed uncontested facts to be supported by admissible
evidence, defendants have met that burden.  Defendants rely on
Weiser's description of its appraisal methodology in its report
as evidence of the methodology Weiser actually used.  (*See* 56.1
Statement Nos. 5, 7-8, 11-15, 24; *see also* Defs.' Mem. Summary
Judgment at 4-6.)  Plaintiff responds that Weiser's report is
inadmissible for that purpose.  (*See* 56.1 Response Nos. 5, 7-8,
11-15, 24.)  Such a response is inapposite, however, because for
all intents and purposes the Complaint incorporates and adopts
the methodology stated in the report as truthful.  The premise
of plaintiff's claim is that Weiser did what it said it did in
its report, but that what it did was negligent.  (*See* Compl. at
¶¶ 61-66, 76-79.)  Put another way, plaintiff does not dispute
in the Complaint - nor has it disputed at any point during the
prosecution of its case[3] - that Weiser actually employed the
valuation techniques described in its report (*see id.*); in fact,
the Complaint states that plaintiff relied on the report as
accurate (*see id.* at ¶ 80).  Under such circumstances, the
veracity of the appraisal methodology set forth in the Weiser
report has effectively been admitted by plaintiff and, as such,

---

[3]     Plaintiff's expert, Hoffman, did not question whether Weiser actually
employed the appraisal methodology set forth in its report, and plaintiff has
not disputed that point in its opposition papers or offered any evidence to
the contrary.

that methodology is an admissible, undisputed fact properly considered on summary judgment.[4]

Nor can plaintiff convince the Court that evidence offered by defendants and their expert regarding the applicable professional standards and Weiser's adherence to them are immaterial to plaintiff's claim.  (*See* 56.1 Response Nos. 22-24, 26-30.)  While the single claim in the Complaint is characterized as one for "Negligent Appraisal," the supporting allegations state a professional negligence cause of action. (*See* Compl. at ¶¶ 75 ("By virtue of the contract between Coudert and Weiser and/or the Code of Professional Ethics of the Appraisal Institute, Defendants owed Coudert a duty to perform the appraisal with due care and to give correct information to Coudert."), 76 ("Defendants failed to perform the appraisal with due care.").)

The law is clear that "[a] claim of professional negligence requires proof that there was a departure from the accepted standards of practice and that the departure was a proximate cause of the injury." *Matthews*, 377 F. Supp. 2d at 356.  The same elements apply to a claim for professional malpractice.

---

[4]     While not dispositive of admissibility, the Court also notes the indicia of truthfulness in the Weiser report itself:  The appraisers certified that "the statements of fact contained in [the] appraisal report and upon which the analyses, opinions, and conclusions expressed herein are based are true and correct."  (Kelly Decl. Ex. C at DSI 747).  Moreover, Coudert hired Weiser to do the appraisal, in a context independent from and predating this litigation.  Under such circumstances, Weiser would have had no clear incentive to undervalue the leasehold.

*See VTech Holdings Ltd. v. Pricewaterhouse Coopers LLP*, 348 F. Supp. 2d 255, 262 (S.D.N.Y. 2004).  Consistent with the Complaint, plaintiff's counsel has previously instructed the Court that it is those elements that apply in this case, stating on the record at a pre-trial conference:

> This case is about malpractice, appraisal malpractice. Our expert report explains why this appraisal firm in our view deviated from the applicable standard of care and undervalued the leasehold interest by approximately $13 million.  That is what this case is about. . . . It is a very simple malpractice case.

(Decl. of William J. Kelly in Further Support of Mot. for Summary Judgment Ex. A at 6.)  Thus, regardless of how plaintiff now characterizes this action, the issue raised by plaintiff's Complaint and counsel, and addressed by defendants in their motions, is whether Weiser performed its appraisal with due care in light of the commonly accepted professional standards.

Defendants having put forth admissible evidence regarding the appraisal methodology they employed and that methodology's adherence to commonly accepted professional standards, it was therefore up to plaintiff to put forth specific facts creating a genuine dispute on the determinative issue.  It has not done so. Plaintiff's motions papers do not even attempt to raise a triable issue of fact, instead attempting to reframe this action as one not about professional negligence (which attempt, as

already discussed, is unsuccessful).[5] Without Hoffman, plaintiff has offered nothing to dispute Duff & Phelps's finding that Weiser's appraisal technique "followed the most commonly accepted professional standards in leasehold valuation." (Kelly Decl. Ex. D at 9.) Indeed, even if the Court were to credit Hoffman's opinions, she does not cite a single professional standard that defendants failed to meet, instead offering her and her partner's own speculative idea about why Weiser's appraisal is "not correct." (Kelly Decl. Ex. H at 54:23-55:8.) Hoffman's divergent opinion – detached from any identified professional standard – fails to raise a triable issue of fact regarding the reasonableness of Weiser's appraisal. Accordingly, summary judgment is appropriate.

---

[5]      In its opposition brief, plaintiff also argues that the Court should disregard the Bankruptcy Examiner's finding that the Weiser appraisal was, if anything, on the high end of the prevailing market valuation range. (Pl.s' Mem. Opp. Summary Judgment at 8-9; see also Kelly Decl. Ex. E at 37-38.) While the Court tends to agree with plaintiff that the Examiner's finding is inadmissible evidence regarding the reasonableness of Weiser's appraisal, it need not – and has not – considered that finding in granting summary judgment for defendants.

CONCLUSION

For the foregoing reasons, defendants' motions to exclude and for summary judgment are granted, and plaintiff's Complaint is dismissed with prejudice.   The Clerk of the Court is directed to terminate the pending motions (Docket Numbers 26 and 27) and close this case.

SO ORDERED

Dated:      New York, New York
            January 24, 2012

_____
KATHERINE B. FORREST
United States District Judge

26